

# NUMBER 13-12-00757-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

TEXAS REAL ESTATE COMMISSION,                                    **Appellant,**

**v.**

CHARLOTTE A. HANSEN AND JAMES
LARRY HANSEN,                                        **Appellees.**

## On appeal from the County Court at Law No. 3
## of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria**
**Memorandum Opinion by Chief Justice Valdez**

By one issue, appellant, the Texas Real Estate Commission (TREC), argues that

the trial court erred by ordering it to pay appellees, Charlotte A. Hansen and James Larry

Hansen, from the Texas Real Estate Recovery Trust Account (the Account). An applicant

is entitled to payment from the Account, in certain circumstances, if the applicant obtains

a judgment against a real estate license or certificate holder. TEX. OCC. CODE ANN. § 1101.601(a) (West, Westlaw through 2013 3d C.S.). TREC contends that funds were not available from the Account because the trial court's judgment in favor of the Hansens in their Texas Fraudulent Transfers Act (TUFTA) claim against Mario and Melissa Gomez, both Texas Real Estate License holders, was not based on the misconduct of the Gomezes. We affirm.

## I. BACKGROUND

The Hansens entered into an agreement with Michael Workman in which Workman agreed to construct a home (the Northpointe property) for the Hansens, "the fair market value of which would be $400,000." Workman promised to complete construction within an eight-month period. As partial consideration for the construction agreement, the Hansens executed a warranty deed on February 11, 2003 conveying title to their existing home (the Westpointe property) to Workman for $150,000 credit, provided to help cover construction costs. The Hansens presented evidence that the Westpointe property had been appraised at more than $400,000. The Hansens also alleged that Workman's brother, Hollie, "falsely represented that their existing property . . . would never be suitable for [the Hansens] to reside in and that they should convey the property to Workman in exchange for Workman . . . providing $150,000 of new construction cost." The Hansens alleged that Workman subsequently "drew more money than was justified against [the Hansens'] interim construction loan . . . . He wholly failed to contribute" the $150,000 consideration he represented to [the Hansens] would be contributed to" construction costs. Moreover, the Hansens alleged that Workman "wholly failed to complete construction within the eight month period he promised."

On February 11, 2003, Workman conveyed the Westpointe property to his son-in-law, Mario Gomez. Gomez acquired an equity loan against the property in the amount of $180,000. As a result, a first lien was placed on the property. Mario Gomez testified that he purchased the property for $200,000 and entered into a loan agreement to cover the remaining cost. He explained that Workman then leased the property back from Gomez. In their pleadings, the Hansens claimed that Workman, not Gomez, made the monthly payments on Gomez's loan from the funds he allegedly overdrew from the Hansens' interim construction loan, which were supposed to be drawn to cover construction costs.

The Hansens alleged that they discovered that Workman had been overdrawing from the interim construction loan and filed the present lawsuit on Febraury 2, 2004.[1] Subsequently, on February 26, 2004, the Hansens' filed a lis pendens prohibiting the Westpointe property from being further alienated pending the resolution of the lawsuit. On September 3, 2004, the Schweizers loaned Gomez and his wife Melissa the money necessary to pay off the first lien on the Westpointe property. On that date the Gomezes executed a note and deed of trust granting a lien on the Westpointe property in favor of the Schweizers. On September 20, 2004, Melissa Gomez executed an acknowledgment that the Gomezes could not make payments on the loan from the Schweizers and agreed that the Gomezes were in anticipatory breach of the note and deed of trust to the Schweizers. On November 3, 2004, the Schweizers purchased the Westpointe property at a trustee's sale.

In their third original petition, which was amended to add claims of fraud committed in connection with the transfer of the Westpointe property to the Schweizers, the Hansens

---

[1] The Hansens originally included Hollie and Michael Workman in the lawsuit, but subsequently nonsuited both parties.

alleged causes of action for civil conspiracy, fraud, fraudulent inducement, fraud in real estate transactions, and fraudulent transfer under both sections 24.005 and 24.006 of TUFTA. On March 7, 2012, following a bench trial, the trial court entered judgment in which it made the following two findings:

1. The Court finds for Plaintiffs and against defendants Mario Gomez, Melissa Gomez, Darrin Schweizer and Bobbiejeania Schweizer with regard to Plaintiffs' claims for violations of the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM CODE §24.001, *et. seq.*

2. The Court finds that, pursuant to TEX. BUS. & COM. CODE §24.013, Plaintiffs are entitled to recover their reasonable and necessary attorney fees.

The trial court awarded the Hansens $40,000 in actual damages and ordered the Gomezes to pay the Hansens $77,000 in attorney's fees. The trial court declined to assess attorney's fees against the Schweizers. The judgment stated, "All relief not expressly granted is denied."

On August 21, 2012, the Hansens filed an application for payment from the Account in which they argued that they were entitled to payment because they had received a judgment against the Gomezes, who were duly licensed as real estate salespersons, that was based on the Gomezes' acts which violated Sections 652(a)(3) and 653(1) of chapter 1101 of the Texas Occupations Code. TEX. OCC. CODE ANN. § 1101.652(a)(3) (West, Westlaw through 2013 3d C.S.); *id.* § 1101.653(a) (West, Westlaw through 2013 3d C.S.). TREC filed a response in objection to the application. After a hearing on the application, the trial court entered an order for payment from the Account. TREC's appeal of the order for payment from the Account followed.

4

## II.    STANDARD OF REVIEW

We review the granting of an application for payment from the account as we do a non-jury trial.  See *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989).  In order for TREC to prevail on its no-evidence arguments, the record must reveal:  (a) an absence of evidence of an essential fact; (b) that rules of law or of evidence prohibit the court from crediting the only evidence supporting a vital fact; (c) there is no more than a mere scintilla of evidence to prove a crucial fact; or (d) the evidence conclusively establishes the opposite of a critical fact.  *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005); *Tex. Real Estate Comm'n v. Asgari*, 402 S.W.3d 814, 816 (Tex. App.—San Antonio 2013, no pet.) (applying the *City of Keller* standard of review to a TREC challenge to a trial court's order for payment from the account).  Reviewing courts must credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not.  *City of Keller*, 168 S.W.3d at 827.

We review issues related to TREC's statutory interpretation arguments under a de novo standard of review.  *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).  In construing a statute, our primary objective is to determine and give effect to the legislature's intent, which we do by looking to the plain and common meaning of the statute's words, unless such a construction leads to an absurd result.  *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008).  Disputed provisions of a statute are to be considered in context, not in isolation.  *Harris County. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009).

## III.    APPLICABLE LAW

**a.    The Account**

The statute allowing recovery from the Account states that the Account is maintained "to reimburse aggrieved persons who suffer actual damages" at the hands of a license holder, certificate holder, or an agent of a license or certificate holder. TEX. OCC. CODE ANN. 1101.601(a). "Texas appellate courts agree [t]he purpose of the Account is to guarantee the fidelity and honesty of the real estate salesman in his dealings with the public and to insure and indemnify any member of the public against damages or injury caused by" misconduct committed by a license or certificate holder. *Asgari*, 402 S.W.3d 814, 816–17 (citations omitted).

Under Texas Occupations Code section 1101.602, "an aggrieved person is entitled to reimbursement from the trust account if a person described by Section 1101.601 engages in conduct described by Section § 1101.652(a)(3) or (b) or 1101.653(1), (2), (3), or (4)." TEX. OCC. CODE ANN. § 1101.602 (West, Westlaw through 2013 3d C.S.). Section 601 includes license holders, certificate holders, and their agents. *Id.* § 1101.601. Section 652(a)(3) stipulates that the commission may suspend or revoke a license if the license holder "engages in misrepresentation, dishonesty, or fraud when selling buying, trading, or leasing real property." *Id.* § 1101.652(a)(3). Section 653(1) stipulates that the commission may suspend or revoke a certificate if the certificate holder "engages in dishonest dealing, fraud, unlawful discrimination or a deceptive act." *Id.* § 1101.601.653(a) (West, Westlaw through 2013 3d C.S.). At the hearing on the application for payment from the account, "the aggrieved person must show that the judgment is based on facts allowing recovery" under the statute. *Id.* § 1101.607(1) (West, Westlaw through 2013 3d C.S.). "The commission may relitigate in the hearing any material and

6

relevant issue that was determined in the action that resulted in the judgment in favor of the aggrieved person." *Id.* § 1101.608(c) (West, Westlaw through 2013 3d C.S.).

**b.    TUFTA**

Under TUFTA,

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE ANN. § 24.005 (West, Westlaw through 2013 3d C.S.).

A judgment under TUFTA may be taken against (1) the first transferor or (2) any subsequent transferee other than a transferee that took in good faith for "value." *Id.* § 24.009(b) (West, Westlaw through 2013 3d C.S.).

## IV.    DISCUSSION

At the hearing on the application for payment and on appeal, TREC has not challenged the trial court's finding that a TUFTA violation occurred. However, TREC claims that the trial courts' original judgment determined that that the Gomezes were liable, as a subsequent transferee, for the fraudulent actions of Workman. *See Id.* TREC

7

argues that the Hansens are not entitled to payment from the Account because the original judgment was not based on misconduct committed by the Gomezes, who were the only real estate license holders involved in the transfers.

In their application and at the hearing on the application, the Hansens argued that the judgment was based on the misconduct of the Gomezes in connection to both the transfer of the property from Workman to the Gomezes and the transfer of the property from the Gomezes to the Schweizers.[2] Because the trial court did not issue findings of fact, we must affirm if we find that there was evidence to support a holding that the judgment was based on acts of the Gomezes entitling the Hansens to payment during either transfer. *See Dallas Cardiology Assocs., P.A. v. Mallick*, 978 S.W.2d 209, 212 (Tex. App.—Texarkana 1998, pet. denied) (determining that when no findings of fact are entered by the trial court, an appellate court must consider the evidence most favorable to the judgment and disregard all contrary evidence and that the court must uphold the trial court's decision if there is sufficient evidence to support it on any legal theory asserted).

TREC argues that the trial court abused its discretion by ordering payment from the Account because (1) there was no evidence in the underlying case that the Gomezes engaged in any interactions with the Hansens during the first transaction between Workman and Gomez that amounted to misrepresentation, dishonesty, or fraud; (2) the second transaction resulting in the transfer of the Westpointe property from the Gomezes

---

[2] At the hearing on the application, the trial court indicated that, in its view, there were not two separate transfers. Instead, it viewed the situation as "a continuing fraudulent transfer that starts with Workman and ends with Schweizer." We address the circumstances as two separate transfers in accordance with parties' briefs. In any event, we find that the number of transfers at issue does not affect our analysis of the case.

8

to the Schweizers did not involve the buying, selling, trading, or leasing of real property and was not a scheme intended to defraud the Hansens; and (3) in its judgment, the trial court denied the Hansens' fraud and conspiracy claims.[3]

## 1. The Second Transaction

In its pleadings, the Hansens alleged that they suffered damages as a result of the security agreement between the Gomezes and Schwiezers, which culminated in the purchase of the property by the Schweizers at a trustee's sale. On appeal, TREC challenges this basis for recovery from the Account on the grounds that (1) it was a credit transaction that did not involve the buying, selling, or leasing of property as required by section 652(a)(3); and (2) it was "an arms-length transaction that was not a sham to defraud the Hansens." However, in its response to the Hansens' application, TREC explicitly stated that it "does not contest that . . . the creation of a lien subject to an immediate foreclosure could be a violation of TUFTA." Moreover, at the hearing on the application, in response to the trial court's statement that it believed that there was "dishonesty" involved in the second transaction, TREC's attorney specifically stated, "I'm not going to defend that transfer, let's put it that way . . . but I would say that was a financing transfer. That wasn't selling, buying, leasing or trading real estate." TREC therefore conceded that the trial court was entitled to find that the transfer of the property from the Gomezes involved misconduct as described by the statute, and cannot now argue that it did not on appeal. *Buck v. Rogers*, 709 S.W.2d 283, 287 (Tex. App.—Corpus

---

[3] Notably, TREC does not challenge its liability on the basis that the Gomezes were acting on their own behalf and not as brokers. In fact, in its appellate brief, TREC expressly concedes that because, in its view, the Gomezes were acting on their own behalf, "liability of the [the Account] to pay damages in this case is limited to actions specifically delineated in Occupations Code Section 1101.652(a)(3), *i.e.* **misrepresentation, dishonesty or fraud when selling, buying, trading or leasing real property**." (emphasis included in original).

Christi 1986, no writ) ("Counsel cannot now urge what was conceded at trial."). Moreover, even if TREC had not conceded this point, given the circumstances of the credit agreement followed by the immediate notice of anticipatory breach, foreclosure, and trustee's sale, the trial court did not err by determining that the Gomezes' actions constituted dishonesty as contemplated by the statute.[4]  *See* Tex. Occ. Code Ann. § 1101.601; *Asgari*, 402 S.W.3d at 816 (applying a no-evidence standard of review to a challenge by TREC to a trial court's order for payment from the account).  Our review of the trial court's ruling on this basis therefore turns solely on whether it was error to order recovery from the Account because the third transaction did not constitute conduct involved with the buying, selling, leasing or trading of real property.[5]

As an initial matter, we find that the Hansens were not required to show that the Gomezes' conduct involved the selling buying, trading, or leasing of real property.   The Hansens alleged in their application that the judgment was based on the Gomezes' acts which violated sections 652(a)(3) and 653(1).  *See id.* §§ 652(a)(3), 653(1).   Section 652(a)(3) requires that the conduct be involved in the buying, trading or leasing of real

---

[4] In addition, while it has not been explicitly challenged by TREC on appeal, there was evidence to support a trial court determination that this transfer was fraudulent under TUFTA.  *See Tex. Real Estate Comm'n v. Asgari*, 402 S.W.3d 814, 816 (Tex. App.—San Antonio 2013, no pet.).  Badges of fraud listed in the TUFTA statute include the following circumstances:  the transfer of property was made to an insider; the transfer or obligation was concealed; and, before the transfer was made or obligation incurred, the debtor had been sued.  Tex. Bus. & Com. Code Ann. § 24.005(b) (West, Westlaw through 2013 3d C.S.).  Here, the Gomezes transferred property that they obtained from Mario's father-in-law for less than the appraised value.  And, after suit had been filed, they entered into a security agreement, which effectively transferred the property in violation of a lis pendens, thereby concealing the transfer by disguising it as a security agreement.

[5] In the judgment, the trial court determined that the defendants were liable to the Hansens for actual damages.   Notably, TUFTA does not specifically allow for the remedy of actual damages. Tex. Bus. & Com. Code Ann. § 24.008 (West, Westlaw through 2013 3d C.S.).  However, TUFTA does provide for "any other relief the circumstances may require" as an equitable remedy.  *See id.*  Regardless, TREC has not argued, to the trial court or on appeal, that an award of actual damages was not available for a TUFTA violation in connection to either transfer.

property; section 653(1) does not. *Id.* TREC contends that, in this case, recovery cannot be based on section 653(1) because the Gomezes were not certificate holders. *Id.* § 652(a)(1). Section 653(1) only provides for the suspension or revocation of a certificate holder; however, the statute governing the Account specifically states that it applies if a person described by Section 1101.601, which includes both license and certificate holders, "engages in conduct described by Section 1101.652(a)(3) or (b) or 1101.653(1), (2), (3), or (4)." TEX. OCC. CODE ANN. § 1101.601(a). Therefore, the plain language of the statute indicates that an aggrieved person can recover if either a license holder or a certificate holder engages in any of the conduct described in either section of the statute. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625–26 (Tex. 2008) (explaining that appellate courts rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results). Accordingly, we conclude that the Hansens were entitled to reimbursement from the Account for the Gomezes' conduct in violation of section 653(1), which was not required to involve the buying, selling, leasing, or trading of real property. *See* TEX. OCC. CODE ANN. § 653(1).

Moreover, even if the Hansens were limited to payment for conduct described in 652(a)(3), we conclude that, under these circumstances, placing a lien on a property eventually resulting in the sale of the property at a trustee's sale involves the selling of the property as contemplated by section 652(a)(3). *See id.* § 652(a)(3). Allowing recovery from the Account for the trial courts' finding that the Gomezes improperly transferred the property to the Schweizers in violation of the lis pendens, which TREC expressly conceded could have amounted to fraud, is entirely consistent with the purpose of the

11

creation of the Account "to reimburse aggrieved persons who suffer actual damages" at the hands of a license holder, certificate holder, or an agent of a license or certificate holder. TEX. OCC. CODE ANN. § 1101.601(a); *see Asgari*, 402 S.W.3d at 816–17.

For the foregoing reasons, we conclude that the trial court did not err by ordering payment from the account based on the conduct of the Gomezes during second transaction. Accordingly, we need not determine whether the trial court could have ordered payment from the Account based solely on the Gomezes' conduct in the first transaction with Workman. See TEX. R. APP. P. 47.1.

### 1) Denial of the Hansens' Fraud and Conspiracy Claims

TREC further contends that "the fact that the Judgment specifies that [the Gomezes] only violated TUFTA establishes that the Trial Court denied relief based on fraud, dishonesty or misrepresentation on the Gomezes' part." It points to the statement in the judgment that "All relief not expressly granted herein is DENIED" as a ruling that that the Hansens' fraud and civil conspiracy claims were expressly denied. TREC argues that therefore "logic dictates that the conclusion that the judgment was rendered against the [Gomezes] merely as subsequent transferees of the property in question and not as active conspirators in a scheme to deny the Hansens . . . ."

However, TREC does not argue or provide any authority indicating that the trial court was estopped or in any way legally precluded from awarding the Hansens recovery on their TUFTA claim on the basis of the Gomezes' fraud by denying them relief on their fraud and conspiracy claims. *See* TEX. R. APP. P. 38.1. In addition, even if the trial court expressly determined that the Gomezes did not commit fraud or conspiracy by denying these claims, it did not hold that they did not commit dishonesty or misrepresentation

12

under the statute.[6]  *See* TEX. OCC. CODE ANN. §§ 1101.601, 1101.652(a)(3), 1101.653(a).

We therefore conclude that the trial court's denial of the Hansens' fraud and civil

conspiracy claims did not prevent it from determining that the judgment was based on the

Gomezes' misconduct as described in the statute.  *See id.*

## V.    CONCLUSION

We affirm the trial court's order.[7]

/**s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
19th day of December, 2014.

---

[6] Notably the trial court ordered the Gomezes, but not the Schweizers, to pay the Hansens attorney's fees.  *See* TEX. BUS. & COM. CODE ANN. § 24.013 (West, Westlaw through 2013 3d C.S.).  ("In any proceeding under this chapter, the court may award costs and reasonable attorney's fees as are equitable and just.").  This further indicates that the trial court based its finding of a TUFTA violation on the Gomezes' conduct.

[7] On appeal, the Hansens argue that the trial court erred in finding that recovery was limited to one transaction.  They contend that the trial court should have ordered payment from the account in the amount of $100,000 instead of $50,000. TEX. OCC. CODE ANN. § 1101.610 (West, Westlaw through 2013 3d C.S.) ("Payments from the trust account for claims, including attorney's fees, interest, and court costs, arising out of a single transaction may not exceed a total of $50,000, regardless of the number of claimants.")  The Hansens, however, did not file a notice of appeal; therefore, we will not consider this issue. *See* TEX. R. APP. P. 25.1.